Sondra TUBWON, Appellant,

v.

David Steven WEISBERG, Respondent.

No. C4–86–211.

Court of Appeals of Minnesota.

Oct. 21, 1986.

Daniel D. Reisman, Minneapolis, for appellant.

Ronald D. Ousky, Minneapolis, for respondent.

Heard, considered and decided by FORSBERG, P.J., and FOLEY and LANSING, JJ.

## OPINION

LANSING, Judge.

This appeal is from an order granting David Weisberg custody of two minor children, only one of whom is his biological child. We affirm.

## FACTS

Sondra Tubwon and David Weisberg met in the spring of 1978. They dated through the summer and in the fall Tubwon began to move in with Weisberg. In October or November Tubwon learned that she was pregnant. Although neither Tubwon nor Weisberg believed that Weisberg was the biological father, they decided to remain together and agreed that Weisberg would act as the child's father. They planned not to tell the child or other people who the child's biological father was until the child was 13 years old. By December 1978 Tubwon and her nine-year-old son had completely moved to Weisberg's house.

Tubwon and Weisberg attended prebirth classes at Children's Hospital in Minneapolis and Weisberg acted as Tubwon's coach at the child's birth. In January 1979 Weisberg used accrued vacation from his regular employment for a temporary, part-time job to earn extra money to buy a crib,

highchair, carseat, and clothes for the expected child.

On May 16, 1979, Tubwon gave birth to a daughter, MKT. Although MKT's paternity has not been established, Tubwon believes that the child's biological father is a native of Nigeria now living in Boston. Tubwon has not seen MKT's biological father since MKT was four months old.

Weisberg actively parented MKT from her birth. He took seven days off work when Tubwon and MKT came home from the hospital and continued to share parenting responsibilities thereafter. In accordance with the parties' agreement to raise MKT together and hold Weisberg out as the biological father, Weisberg assumed the full range of parental rights and duties. He frequently took MKT to day care on his way to work, picked her up on his way home, and maintained contact with the day-care staff. Weisberg did most of the family's laundry. He often tucked MKT into bed at night and sat with her until she went to sleep because Tubwon usually refused MKT's request to do so.

Tubwon also undertook parental responsibilities. She nursed MKT, introduced her to solid foods and usually gave her baths. She took care of MKT's medical needs. Since MKT's birth, Tubwon has been in treatment for emotional problems. Her emotional health has periodically prevented her from providing MKT with responsible care and guidance.

In the late spring of 1981 Tubwon became pregnant again. Tubwon was ambivalent about caring for another child. In an effort to encourage Tubwon to continue the pregnancy, Weisberg agreed to assume full custody of the child after birth if their relationship ended. On January 28, 1982, Tubwon gave birth to another daughter, HAT. Although Tubwon and Weisberg never married, both acknowledged that Weisberg was HAT's biological father, and he was adjudicated to be her father on January 18, 1986.

Weisberg, Tubwon, and the children continued to live at Weisberg's South Minneapolis home. Weisberg actively parented both children. In August 1984 Tubwon was admitted to Abbott Northwestern Hospital for treatment of exhaustion and depression. The children remained at home with Weisberg until September 3, 1984, when Tubwon, on leave from the hospital, removed the children from Weisberg's home and placed them in the custody of her mother and stepfather. Tubwon and her parents refused to return the children to Weisberg's custody.

On September 7, 1984, Weisberg filed a complaint seeking permanent custody of MKT and HAT, subject to Tubwon's reasonable visitation. On September 12, 1984, the trial court granted temporary custody of both girls to Tubwon and ordered the Hennepin County Department of Court Services to conduct a custody study to be completed by December 4, 1984. This custody study was not completed because Tubwon would not cooperate with the assigned counselor.

On March 6, 1985, the trial court ordered Tubwon to cooperate with Court Services or face sanctions. The referee continued the custody study and evaluation to May 9, 1985. Tubwon again refused to cooperate, and a second Court Services counselor was unable to complete his evaluation and recommendations on the scheduled date. Tubwon refused to keep appointments or maintain contact with the evaluators. Although the custody mediators were changed twice at Tubwon's request, she failed to keep those appointments as well.

On August 2, 1985, a third counselor from the Hennepin County Department of Court Services recommended that Tubwon be granted custody of the children on the condition that she and the girls continue in and successfully complete therapy with their present therapists. However, that counselor also cautioned that her evaluation was incomplete because of Tubwon's unavailability and further commented that

> [m]any concerns exist in regard to [Tubwon's] lack of cooperation with this evaluation, her current mental status, possible past physical abuse of the children,

and possible failure to ensure [MKT's] school attendance. However, based on what information was gained in this custody evaluation, none of these concerns has yet been substantiated. Much information regarding [Tubwon] remains missing.

The same counselor stated in an August 7, 1985, deposition that she understood custody should be awarded to Tubwon absent overwhelming evidence that Tubwon was an unfit parent.

On October 2, 3, and 9, 1985, the trial court held an evidentiary hearing on the issue of custody. On December 19, 1985, the trial court issued findings and an order.

The court evaluated the children's best interests by applying the guidelines in Minn. Stat. § 518.17 and found that it was in the children's best interests to be in the legal and physical custody of Weisberg. In determining custody of MKT, the court cited *Wallin v. Wallin*, 290 Minn. 261, 187 N.W.2d 627 (1971), which establishes the standard for awarding custody to third parties over the objection of a biological parent. In applying this standard, the court found:

> [Weisberg] has more strongly emerged as the primary parent [but] * * * such a determination is unecessary due to [the court's] simultaneous finding that [Tubwon] is incapable of providing the girls with responsible care and guidance due to her anger, hostility, depression, and resulting inactivity. The Court finds that the children's emotional health would be impaired by being placed in [Tubwon's] custody. * * * [Tubwon's] psychological state renders her presently unfit and unable to meet the children's needs and act in their best interests.

Weisberg was granted sole legal and physical custody of the children, subject to liberal visitation by Tubwon. Tubwon appealed.

## ISSUE

Did the trial court err in granting custody of two siblings to the biological father of one, rather than the biological mother of both?

## ANALYSIS

The trial court's order decided the custody of both MKT and HAT. Tubwon acknowledges the court applied the correct "best interests" of the child standard in granting Weisberg custody of HAT, the biological child of both parties. *See* Minn. Stat. § 518.17. However, Tubwon argues that the court improperly applied this same standard in determining the custody of MKT, the biological child of only Tubwon.

Tubwon correctly observes that the court's findings consider the best interests of MKT and HAT. But the trial court's analysis does not end there. The findings go on to consider the custody standard where a third party seeks custody over the objections of a biological parent. That two-part standard is set out in *Wallin v. Wallin*, 290 Minn. 261, 187 N.W.2d 627 (1971):

> In determining custody disputes between the [biological parent] of a minor child and [a third party], courts have based their decisions on two basic doctrines. The first of these doctrines stands for the proposition that a [biological parent] is entitled to the custody of [their] children unless it clearly appears that [they are] unfit or [have] abandoned [their] right to custody, or unless there are some extraordinary circumstances which would require that [they] be deprived of custody. The second doctrine is the so-called best-interests-of-the-child concept, according to which the welfare and interest of the child is the primary test to be applied in awarding custody.

*Id.*, 290 Minn. at 264, 187 N.W.2d at 629 (citation omitted).

The court found, based on evidence in the record, that Tubwon is currently unfit to parent MKT. The evidence centers on Tubwon's instability of character and inability to furnish MKT with needed care. School personnel testified regarding MKT's poor attendance and lack of development due to her unstimulating home environment and lack of support. A psychologist testified

that, although MKT has intelligence in the superior range, she functions at a considerably lower level due to the chaos in her life.

Tubwon moved six times during the year preceding trial. The frequent moves resulted in a lack of stability and continuity for MKT. The evidence is uncontroverted that Tubwon is chronically depressed and overwhelmed with the responsibility of caring for her family. She becomes emotionally and physically immobilized and is unable to follow through with plans or address the children's needs. On occasion she dresses MKT improperly or inadequately and does not always provide well-balanced or regular meals.

Although the trial court referred to the parental unfitness standard established in *Pikula v. Pikula*, 374 N.W.2d 705 (Minn. 1985), which applies to custody disputes between biological parents, the court's reliance on the *Wallin* standard is evident.

The trial court's consideration of the best interests of MKT as well as the best interest of HAT is appropriate. The best interests of the child is the second part of the *Wallin* standard and applies in determining custody between a biological parent and a third party.

■ The trial court's finding that MKT's best interests require granting custody to Weisberg is supported by the evidence. This is based on the same evidence which supports Tubwon's parental unfitness and an evaluation of Weisberg as a parent. Weisberg has provided MKT with supervision, stability and love. He has established a parent-child bond with her identical to the bond formed by biological parents with their children. He has been actively involved with school personnel, ensures that homework is done and school attended, and assists with MKT's adjustment to school. Weisberg's physical, emotional, and psychological condition allow him to provide the care and guidance necessary to raise MKT. He has lived in the same house, which he owns, for more than ten years. He has been continuously employed in the same field for the last 16 years. Tubwon clearly loves her children, but she is unable to attend to their daily needs and provide them with a stable environment.

We cannot say that, absent the unusual facts of this case, the evidence of Tubwon's unfitness would be of sufficient gravity to satisfy the *Wallin* standard. However, these facts are compelling. Weisberg has been MKT's de facto parent since her birth. Tubwon voluntarily entered into this situation holding Weisberg out as MKT's father. Her actions created the central role that Weisberg assumed in MKT's life.

■ Tubwon's primary argument for reversing the custody of HAT assumes custody of MKT will be returned to her and it would be harmful to have the girls separated. We do not overlook the importance of MKT and HAT remaining together. However, the evidence overwhelmingly supports the court's finding that it is in HAT's best interests to remain in the custody of her father. We find no error in the court's determination of her custody. Thus, Tubwon's argument against separation of the children applies with equal force to allowing MKT to remain in Weisberg's custody.

Finally, the Minnesota Supreme Court has recognized the doctrine of the best interests of the child as paramount in determining "the circumstances in which children are required to live." *Matter of the Welfare of JJB*, 390 N.W.2d 274, 279 (Minn. 1986). The trial court's decision was based on the applicable standards, and there was no abuse of discretion.

■ Tubwon also claims that the trial court erred in failing to take into account the protection of the children's racial and ethnic heritage. Tubwon is of Black, American Indian and Irish heritage. Weisberg is Jewish. The trial court examined the children's cultural heritage and made specific findings on this important consideration as required by Minn. Stat. § 518.17, subd. 1(i). The court found that "[b]oth parties seek to expose the children [to] and educate them with respect to these different cultures." We believe due weight was accorded the children's racial and cultural needs.

## DECISION

The trial court applied the proper standards and did not abuse its discretion in granting Weisberg, who is not MKT's biological parent, custody of MKT and HAT over the objections of the children's biological mother.

Affirmed.